UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No: **00-6254 CR-ROETTGER**

18 U.S.C. §371
18 U.S.C. §1341
18 U.S.C. §1343
18 U.S.C. §1956(a)(1)(A)(i)

**MAGISTRATE JUDGE SNOW**

UNITED STATES OF AMERICA, )
)
    Plaintiff, )
)
v. )
)
MICHAEL ZOYES, )
)
    Defendant. )
)
_____)

INFORMATION

The United States Attorney charges that:

### COUNT 1

(CONSPIRACY TO COMMIT WIRE AND MAIL FRAUD,
AND TO LAUNDER PROCEEDS)

1. From in or about September 1993, to in or about December 1996, at Broward County, in the Southern District of Florida and elsewhere, the defendant,

**MICHAEL ZOYES,**

knowingly and willfully combined, conspired, confederated, and agreed with others known and unknown to the Grand Jury, to commit offenses against the United States, that is: a) to devise a

scheme and artifice to defraud and for obtaining money from persons throughout the United States by means of false and fraudulent pretenses, and for the purpose of executing and attempting to execute said scheme and artifice, to transmit and cause to be transmitted in interstate commerce by means of wire communication, certain signals and sounds, in violation of Title 18, United States Code, Section 1343; b) to devise a scheme and artifice to defraud and for obtaining money from persons throughout the United States by means of false and fraudulent pretenses, and for the purpose of executing and attempting to execute said scheme and artifice to place and cause to be placed in post offices and other authorized depositories for mail matter, matters and things to be sent and delivered by the United States Postal Service and deposit and cause to be deposited matters and things to be sent and delivered by private and commercial interstate carrier, in violation of Title 18, United States Code, Section 1341; and c) to conduct and attempt to conduct financial transactions involving the proceeds of wire fraud and mail fraud with intent to promote the carrying on of the wire fraud and mail fraud knowing the proceeds involved in the financial transactions represented the proceeds of the unlawful scheme to defraud, in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i).

**OBJECT OF THE CONSPIRACY**

2.   It was the purpose and object of the conspiracy and the scheme to defraud for the Defendant, MICHAEL ZOYES, and co-conspirators to unlawfully enrich themselves by obtaining money from victims who were induced to purchase distributorships for various products to purchase display racks and inventory of nutritional supplements, health and beauty products, and locations for the display racks and inventory by means of false and fraudulent pretenses, representations and promises, and by concealing and omitting material facts, and by using the proceeds of the scheme to carry on and promote the scheme through which means the defendant, and co-conspirators, extracted more than $7,000,000 from more than 1,100 victims throughout the United States.

**BACKGROUND**

3.   From in or about August 1993, to in or about December 1996, the defendant was an owner or employee of one or more of the following fraudulent telemarketing operations:

    A.  Southeast Necessities Company, Inc., d/b/a Doctor's Choice Nutritional Supplements (hereinafter "Dr.'s Choice");

    B.  Allstate Locating, Inc. (hereinafter "Allstate");

    C.  Vange, Inc., d/b/a Option One Health Factors (hereinafter "Option One");

D. Bradcor Enterprises, Inc., d/b/a Quantum Force (hereinafter "Quantum Force");

E. Sunrise Sales, Inc. (hereinafter "Sunrise Sales"); and

F. Komplete Beauty and Health Supply, Inc., d/b/a NU U Cosmetics (hereinafter "NU U").

4. Dr.'s Choice, Option One, Quantum Force, and NU U (hereinafter collectively referred to as "the Companies"), and Allstate and Sunrise Sales (hereinafter collectively referred to as "the locator companies"), constituted a unitary scheme to defraud as they were essentially the same business enterprise. The companies had many of the same principals and employees and used essentially the same sales pitch and sales techniques. In telephone calls, co-conspirators made misrepresentations about the length of time each company had been in business and the profits made by "distributors" of the products. The telemarketing businesses worked with "locator companies" that purported to find locations from which the products purchased by the victims could be displayed and sold. The victims paid the locator companies a fee for each location and the locator companies "kicked back" a portion of their gross sales to the Companies or their principals in return for referrals from the Companies. Co-conspirators at the "locator companies" repeated the misrepresentations made by the co-conspirators at the Companies. Each telemarketing business paid

false "references" to repeat and reinforce the misrepresentations made by the telemarketing business. Each telemarketing business used high pressure sales tactics which included misrepresentations regarding the selection process for "distributorships" and the extent of the demand for the products involved.

5. The co-conspirators and the Companies conducted "telemarketing" as that term is defined in Title 18, United States Code, Section 2325, that is, they induced persons to purchase goods and services by use of one or more interstate telephone calls initiated by the co-conspirators or by the prospective purchasers.

6. Front room sales people ("fronters") would make the initial sales presentation to a potential customer. The sales presentation would contain numerous misrepresentations designed to induce the potential customer to apply for selection as a "distributor" and ultimately to purchase display racks and inventory. Fronters caused promotional materials to be sent by overnight commercial interstate carrier. They would provide to potential customers the names and telephone numbers of "references" (hereinafter called "fake references.")

7. Fake references were contacted by potential customers who wanted information about the Company, the products and the profitability of owning a "distributorship." The fake reference purported to be a current distributor of the product who would mislead and deceive customers as to the amount of product sold per

5

location, the length of time the Company was in business and how much money the fake reference made by owning a distributorship.

8. A sales room manager would speak with potential customers and reinforce misrepresentations made to them by the fronters and fake references in order to further mislead and deceive the customer, to induce the customer into sending a deposit and application to the telemarketing business and ultimately to purchase displays and inventory. The sales room manager would obtain from the fake references information regarding the level of interest of a potential customer.

9. A "closer" would re-contact the potential customer shortly after the customer had sent a deposit and distributorship application to one of the Companies. The closer would induce the potential customer to increase the number of displays and amount of inventory the customer would commit to purchase by making misrepresentations designed to mislead and deceive the customer into believing he or she was in competition with other potential customers for selection as a distributor.

<u>DR.'S CHOICE</u>

10. Between in or about September 1993, and September 1994, Dr.'s Choice sold business opportunities, that is "distributorships" for nutritional supplements. The offices of Dr.'s Choice were located at 4545 N.W. 103rd Avenue, Sunrise, Broward County, Florida.

6

11. MICHAEL ZOYES, and co-conspirators Germaine Easley, David Kallen were the true owners of Dr.'s Choice. As partners, they managed the daily affairs of the business and shared in the profits. The business expenses were paid with the funds generated from the scheme.

### ALLSTATE LOCATING, INC.

12. Between in or about September 1993, and September 1994, Allstate operated as a "locator company." Allstate was a telemarketing business that purported to secure locations for placement of product displays and inventory purchased by victim customers of Dr.'s Choice. The Allstate office was located at 4501 N.W. 103rd Avenue, Sunrise, Broward County, Florida.

13. Marc F. Kallen was the owner and president of Allstate. He ran the daily business affairs of Allstate and paid a "kick back" or referral fee to MICHAEL ZOYES and David Kallen for Dr.'s Choice referring business to his company. He also acted as a business reference for Dr.'s Choice and made misrepresentations to potential customers of Dr.'s Choice and Allstate.

### FEDERAL INJUNCTION

14. In or about September 1994, in the United States District Court for the Southern District of Florida, a temporary injunction was issued enjoining Dr.'s Choice, Allstate and their principals, including MICHAEL ZOYES, and co-conspirators David Kallen, Germaine Easley, Marc F. Kallen, from doing business. Pursuant to an

October 1995, court approved stipulated final judgment and order for permanent injunction, the principals of Dr.'s Choice and Allstate were permanently restrained and enjoined from engaging or participating directly or indirectly in the marketing or sale of any "Franchise or Business Venture" or in the business of telemarketing. The principals of Dr.'s Choice and Allstate were prohibited from using any aliases or from otherwise misrepresenting their true identities in the course of business dealings. MICHAEL ZOYES, David Kallen, and Germaine Easley, were ordered to pay a judgment in the amount of $120,000. Marc F. Kallen was ordered to pay a judgment in the amount of $40,000.

OPTION ONE

15. From in or about October 1995, the principals of Dr.'s Choice, that is, MICHAEL ZOYES, David Kallen, and Germaine Easley and other co-conspirators, continued their telemarketing scheme using the name Option One. Option One was engaged in the same type of business as Dr.'s Choice. It sold business opportunities, that is, distributorships for nutritional supplements and health supplies. Option One's main offices were located at 5950 West Oakland Park Boulevard, Broward County, Florida. The mailing address was 10101 Grosvenor Place, Suite 1704, Rockville, MD 20852.

16. Option One was formed, in part, by the former principals of Dr.'s Choice, that is, MICHAEL ZOYES, David Kallen, Germaine Easley, in order to generate the funds necessary to pay the

$120,000 judgment from the above referenced federal injunction law suit.

17. MICHAEL ZOYES and co-conspirators David Kallen, Germaine Easley, and Alvin Himelblau, were the true owners of Option One. MICHAEL ZOYES, Germaine Easley, and Alvin Himelblau managed the daily business affairs of Option One and shared a percentage of the profits with David Kallen. The business expenses of Option One were paid with funds generated from the scheme.

QUANTUM FORCE

18. In or about March 1996, MICHAEL ZOYES and co-conspirators Marvin Simon and the principals from Option One, that is, David Kallen and Germaine Easley, continued the telemarketing scheme under the name Quantum Force. Like Doctor's Choice and Option One, Quantum Force sold business opportunities, that is, distributorships for nutritional supplements and health and beauty related products. From in or about March 1996, to in or about September 1996, Quantum Force's main offices were located at 2701 West Oakland Park Boulevard, Oakland Park, Broward County, Florida. The mailing address was 1975 East Sunrise Boulevard, Suite 501, Fort Lauderdale, FL 33304.

19. MICHAEL ZOYES and co-conspirators David Kallen and Marvin Simon, were the true owners of Quantum Force and shared in the profits. MICHAEL ZOYES, together with David Kallen, and Marvin Simon managed the daily business affairs of Quantum Force. The

9

business expenses of Quantum Force were paid with funds generated from the scheme.

### SUNRISE SALES

20. Proceeds generated by the telemarketing scheme at Quantum Force were used to fund start-up costs for Sunrise Sales, a "locator company." In or about August 1996, Sunrise Sales was incorporated in the State of Florida. The offices of Sunrise Sales were located at 4699 North State Road 7, Ft. Lauderdale, Broward County, Florida. Sunrise Sales was as a telemarketing business which purported to secure locations for placement of the product displays and inventory purchased by victim customers of Quantum Force and NU U.

21. Sunrise Sales paid a "kick back" or referral fee to the owners of NU U, including MICHAEL ZOYES for referring customers to Sunrise Sales.

### NU U

22. In or about September 1996, principals from Quantum Force, MICHAEL ZOYES, David Kallen, and Marvin Simon continued their telemarketing scheme utilizing the name NU U. NU U was engaged in the same type of business as Dr.'s Choice, Option One, and Quantum Force. NU U sold business opportunities, that is, distributorships for beauty supplies. The offices of NU U were located at 1500 N.W. 62nd Street, Fort Lauderdale, Broward County, Florida.

10

23. MICHAEL ZOYES and co-conspirators David Kallen and Marvin Simon were the true owners of NU U. MICHAEL ZOYES and Marvin Simon managed the business affairs of NU U. They each shared in the profits until NU U was sold. The business expenses of NU U were paid with funds generated from the scheme.

### MANNER AND MEANS

The manner and means by which the defendant and his co-conspirators sought to accomplish the object of the conspiracy included the following:

24. It was part of the conspiracy that the Companies would advertise in newspapers throughout the United States, a business opportunity involving allegedly restocking displays in busy retail businesses with a minimum investment of $5,000. The advertisements would contain a toll free telephone number for the telemarketing business.

25. It was further part of the conspiracy that persons responding to the advertisements would be contacted telephonically by fronters for the telemarketing business. A fronter would make the initial sales presentation which contained misrepresentations designed to induce the potential customer to apply for selection as a distributor, and ultimately to purchase display racks and inventory. Fronters would cause promotional materials to be sent to potential customers by overnight commercial interstate carrier, such as Federal Express and Airborne Express.

26. It was further part of the conspiracy that within a few days after the promotional materials were sent, the fronter would re-contact the potential customer by telephone in order to give that person the names and telephone numbers of references purported to be current distributors of the product, when in truth and in fact, and as the fronter well knew, these references were not distributors nor had they ever been distributors for the business, rather they were paid by the Companies to make the false representations.

27. It was further part of the conspiracy that during the telephone calls with potential customers, the references would mislead and deceive customers about the profitability of the business opportunity with fabricated stories of great success and financial gain, designed to induce the potential customer to apply for a distributorship and to purchase display racks and inventory. Unbeknownst to the customers, the references would report to and be paid by one of the Companies. The amount a reference was paid would be based upon the number of potential customers the reference spoke to over the telephone and whether the potential customer purchased display racks and inventory.

28. It was further part of the conspiracy that fronters would refer potential customers to locator companies, which companies would, for a fee, allegedly provide locations in busy retail businesses where distributors could place display racks and

12

inventory. In return for these referrals, the locator companies paid to the telemarketing business a kickback that was an agreed upon amount per location.

29. It was further part of the conspiracy that fronters would lead potential customers to believe that a distributorship for an area would be chosen by a "selection committee" and/or "the board" from a "pool of applicants," when in truth and in fact, and as the fronter well knew, there was no "board" or "selection committee," nor was there a "pool of applicants" competing for a distributorship.

30. It is further part of the conspiracy that after a potential customer had contacted fake references and a locator company, the potential customer would be urged by a fronter to submit quickly an application and fee for a distributorship in order to be included in a "pool of applicants" from which a distributor was about to be selected, when in truth and in fact, and as the fronter well knew, there was no selection process for distributorships and virtually every customer who paid the application fee would be selected as a distributor.

31. It was further part of the conspiracy that after the application fee was received by the Company, a "closer" would telephonically contact the applicant to induce the applicant to increase the number of displays and amount of inventory the applicant would commit to purchase by leading the applicant to

13

believe that he or she was one of a selected few applicants under consideration to be chosen as a distributor for a given area. The closer would further imply that the greater the number of displays purchased, the greater the likelihood the applicant would be selected as the area distributor, when in truth and in fact, and as the closer well knew, there was no competition for distributorships as virtually all applicants were selected as a distributor.

32. It was further part of the conspiracy that shortly after the applicant committed to purchase a certain number of display racks, the closer would re-contact the applicant to congratulate him or her for being selected as a distributor.

33. It was further part of the conspiracy that the newly selected distributor would be instructed by the closer or a customer service representative how to fill out the order form for display racks and inventory and how to determine the corresponding amount of money owed to the Company. The distributor would be instructed to send by overnight commercial interstate carrier, such as Federal Express and Airborne Express, a cashier's check in the amount owed to the Company.

34. It was further part of the conspiracy that the principals would carry on the scheme by using the profits to pay business expenses.

**OVERT ACTS**

35. In furtherance of this conspiracy and to effect the objects thereof, there was committed by Defendant MICHAEL ZOYES, or co-conspirators, at least one of the following overt acts, among others, in the Southern District of Florida and elsewhere:

A. In or about September 1993, Defendant ZOYES arranged to have mailers sent to businesses in some areas of the country to test interest levels in the nutritional supplements products.

B. In or about May 1994, Defendant ZOYES recruited Ron Hoppe to work as a salesperson at Doctor's Choice.

C. In or about September 1995, Alvin Himelblau, at the direction of Defendant ZOYES, rented office space for the business operations of Option One.

D. In or about October 1995, Defendant ZOYES paid a $60,000 fine to the Federal Trade Commission using profits made at Option One.

E. In or about March 1996, Alvin Himelblau, at the direction of Defendant ZOYES, rented office space for the business operations of Quantum Force.

F. In or about July 1996, Defendant ZOYES, along with David Kallen and Marvin Simon, paid $1,000 to Mitch Maisel to purchase the corporation Komplete Beauty and Health.

G. In or about August 1996, Defendant ZOYES and Anthony Gregorio rented office space for the business operations for Nu U.

H. In or about September 1996, Defendant ZOYES acted as a fake reference for Nu U, utilizing the name "Daniel Furin".

All in violation of Title 18, United States Code, Section 371.

*(signature)*
GUY A. LEWIS
UNITED STATES ATTORNEY

*(signature)*
LAURENCE M. BARDFELD
ASSISTANT UNITED STATES ATTORNEY

16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA
v.

MICHAEL ZOYES

CASE NO. _____
**CERTIFICATE OF TRIAL ATTORNEY***

**Superseding Case Information:**

New Defendant(s)    Yes ____    No ____
Number of New Defendants ____
Total number of counts ____

**Court Division:** (Select One)

____ Miami    ____ Key West
_X_ FTL    ____ WPB    ____ FTP

I do hereby certify that:

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3. Interpreter: (Yes or No) __No__
   List language and/or dialect __English__

4. This case will take __0__ days for the parties to try.

5. Please check appropriate category and type of offense listed below:
   (Check only one)    (Check only one)

   | | | | | |
   |---|---|---|---|---|
   | I | 0 to 5 days | _X_ | Petty | ____ |
   | II | 6 to 10 days | ____ | Minor | ____ |
   | III | 11 to 20 days | ____ | Misdem. | ____ |
   | IV | 21 to 60 days | ____ | Felony | _X_ |
   | V | 61 days and over | ____ | | |

6. Has this case been previously filed in this District Court? (Yes or No) __NO__
   If yes:
   Judge: _____ Case No. _____
   (Attach copy of dispositive order)

   Has a complaint been filed in this matter? (Yes or No) __NO__
   If yes:
   Magistrate Case No. _____
   Related Miscellaneous numbers: __97-6168-CR-FERGUSON__
   Defendant(s) in federal custody as of _____
   Defendant(s) in state custody as of _____
   Rule 20 from the _____ District of _____

   Is this a potential death penalty case? (Yes or No) __NO__

7. Does this case originate from a matter pending in the U. S. Attorney's Office prior to April 1, 1999? _X_ Yes ___ No  If yes, was it pending in the Central Region? _X_ Yes ___ No

8. Did this case originate in the Narcotics Section, Miami? ___ Yes _X_ No

_(signature)_
LAURENCE M. BARDFELD
ASSISTANT UNITED STATES ATTORNEY
Florida Bar No. 712450

*Penalty Sheet(s) attached
N:\udd\asparks\Bardfeld\Bardfeld\Zoyes\Zoyes.wpd

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA
# PENALTY SHEET

Defendant's Name: __MICHAEL ZOYES__          No.:_____

Count #I:

Conspiracy to Commit Mail and Wire Fraud and Money Laundering; in violation of 18 U.S.C. 371, 1341, 1343, and 1956.

*Max Penalty:    5 years' maximum imprisonment; $250,000 fine

Count #

*Max Penalty:

Count #

*Max Penalty:

Count #

*Max Penalty:

Count # :

*Max Penalty:

*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms or forfeitures that may be applicable.

REV. 12/12/96